## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| MICHELLE ELIZABETH WILLIS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:24-CV-01503-DCN<br><br>DISTRICT JUDGE DONALD C. NUGENT<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Michelle Elizabeth Willis ("Plaintiff" or "Ms. Willis") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

### I.     Procedural History

On January 28, 2022, Ms. Willis filed applications for DIB and SSI, alleging a disability onset date of March 5, 2020. (Tr. 74, 97.) She alleged disability due to back issues, neck issues, anxiety, and depression. (Tr. 75, 86.) Ms. Willis's applications were denied at the initial level (Tr. 74, 97) and upon reconsideration (Tr. 98-99), and she requested a hearing (Tr. 140-41). On September 19, 2023, a telephonic hearing was held before an Administrative Law Judge

1

("ALJ").  (Tr. 34-73.)  On October 3, 2023, the ALJ issued a decision, finding Ms. Willis has not been under a disability within the meaning of the Social Security Act from March 5, 2020, through the date of the decision.  (Tr. 15-33.)  Ms. Willis sought review of the decision by the Appeals Council.  (Tr. 207-08.)  On July 9, 2024, the Appeals Council found no reason to review the decision, making the October 3, 2023 decision the final decision of the Commissioner.  (Tr. 1-7.)   On September 9, 2024, Ms. Willis filed a Complaint challenging the Commissioner's final decision denying her social security disability benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 7, 9 & 10.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Willis was born in 1971 and was 48 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset date. (Tr. 75, 86.)  She turned 50 during these proceedings, making her an individual closely approaching advanced age.  (*Id.*)  She obtained a high school education and an STNA license. (Tr. 44, 245.)  She has not worked since March 5, 2020, the alleged onset date.  (Tr. 75, 86.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

##### i.    Physical Impairments

On March 5, 2020, Ms. Willis started treatment at Family Health Physical Medicine LLC ("Family Health") in Alliance, Ohio for back and neck pain and headaches.  (Tr. 543-46, 556-58, 565-66.)  An x-ray on that date showed: reversal of cervical curve with 32% hypolordosis in the cervical spine and normal curve of the thoracic and lumbar spines; segmental disfunction at C0/C1, C3/4, C4/5, C5/6 T1/2, T2/3, T3/4, and L1/2; degenerative disc disease at C4/5; severe

degenerative disc disease at L5/S1; and possible ligament damage, muscle spasm, and nerve root involvement in all areas of the spine.  (Tr. 555.)  Ms. Willis reported: neck pain that went into her shoulders, arms, and hands; back pain with pain in her buttocks, legs, and feet; hand, arms, legs, and feet frequently falling asleep or becoming numb; frequently falling or tripping; and headaches.  (Tr. 565.)   She also reported anxiety and racing heart but denied depression, mood swings, and irritability.  (*Id.*)  Physical examination by Laurie A. Esper, APRN-CNP, showed stiffness and pain at the low back, cervical, and thoracic regions (Tr. 556) and severe bilateral tenderness on palpation at the cervical and lumbar spine (Tr. 566).  CNP Esper diagnosed Ms. Willis with cervicalgia, pain in thoracic spine, low back pain, and headache.  (*Id.*)  She prescribed a back brace, a cervical pillow, trigger point injections, chiropractic treatment, and physical therapy.  (Tr. 556-57.)

After this initial appointment, Ms. Willis returned to see CNP Esper on March 9, 13, and 19, 2020.  (Tr. 566-70.)  She consistently endorsed severe neck pain (9/10), severe lumbar pain (8/10), and severe headaches.  (Tr. 567-68.)  That month, CNP Esper wrote Ms. Willis multiple letters excusing her from work pending further evaluation.  (Tr. 547-50.)  Ms. Willis received trigger point injections in March and April 2020 as prescribed.  (Tr. 572-59.)  She also saw a chiropractor several times (Tr. 590-98) and attended physical therapy (Tr. 609-18).

On May 13, 2020, Ms. Willis saw CNP Esper for neck pain and headaches.  (Tr. 570.)  She reported 5/10 pain in her neck, 6/10 middle back pain, and 8/10 lower back pain.  (*Id.*)  She had moderate bilateral tenderness on palpation at the cervical, thoracic, and lumbar spine (Tr. 570-71).  Ms. Willis was released from treatment at Family Health and advised to seek chiropractic treatment as needed.  (Tr. 571.)

Ms. Willis presented to her primary care physician Jean Dib, M.D., at Premier Health Alliance on May 18, 2020, complaining of severe headaches.  (Tr. 492-93.)  Dr. Dib prescribed Topamax.  (Tr. 492.)  On May 26, 2020, Ms. Willis underwent a brain MRI that showed mild prominence of the optic nerves sheath and mild to moderate diffuse cerebral atrophy.  (Tr. 527.)

Ms. Willis returned to see Dr. Dib on June 1, 2020, to follow-up regarding the MRI.  (Tr. 490.)  She reported severe and worsening headaches with blurred vision.  (*Id.*)  Dr. Dib diagnosed intracranial hypertension, referred her to neurosurgery, and continued Topamax.  (*Id.*)

At a June 26, 2020 appointment with Dr. Dib, Ms. Willis continued to report severe and worsening headaches.  (Tr. 486.)  Dr. Dib diagnosed migraines without aura and generalized anxiety disorder ("GAD").  (*Id.*)  She refilled Topamax and continued a prescription for Celexa.  (*Id.*)  Nine months later, on April 1, 2021, Ms. Willis reported severe headaches that were not improving, and Dr. Dib prescribed Amitriptyline instead of Topamax.  (Tr. 480-81.)

Five months later, on September 16, 2021, Dr. Dib diagnosed Ms. Willis with irritable bowel syndrome ("IBS") without diarrhea based on complaints of severe abdominal pain; she prescribed Trulance.  (Tr. 473.)  Ms. Willis continued seeing Dr. Dib to manage her IBS in 2021 but did not mention continuing headaches.  (*See* Tr. 467, 471.)

Ms. Willis returned to Dr. Dib on January 13, 2022, complaining of worsening bilateral hand tingling and anxiety.  (Tr. 465-66.)  She did not report headaches, and her depression screen was negative.  (*Id*.)  Dr. Dib prescribed Meloxicam and referred Ms. Willis for an electromyogram ("EMG") of the bilateral upper extremities.  (Tr. 465.)  The EMG on January 25, 2022 showed no evidence of neuropathy, plexopathy, or radiculopathy, but her physical examination that day did reveal a positive shoulder impingement test.  (Tr. 450-51, 520-21.)

Ms. Willis sought chiropractic treatment at Chapel Street Chiropractic on January 28, 2022. (Tr. 538-41.) She reported: her back pain was very severe; it came and went and affected how she washed and dressed; it reduced her sleep by less than 50% and prevented her from sitting more than one hour and standing more than half an hour; she could only lift very light weights; and pain restricted her ability to travel and her social life. (Tr. 539.) On examination, she had a mildly limited range of motion at the cervical spine, and soreness/tightness at the dorsolumbar spine affected her range of motion. (Tr. 538.)

On February 7, 2022, Ms. Willis presented to Thomas A. Krupko, M.D. at Mercy Musculoskeletal Center Alliance complaining of lower back and neck pain with headaches. (Tr. 453-55.) On examination, she had normal strength in her arms, excellent leg strength, normal sensation, and negative straight leg raises bilaterally. (Tr. 455.) But she demonstrated restricted range of motion in her neck and spine and difficulty bending. (*Id.*) X-rays showed degenerative changes in her lower back and neck. (*Id.*) Dr. Krupko referred Ms. Willis for pain management and ordered an MRI of her neck. (*Id.*) He prescribed Topamax and Levothyrozine. (*Id.*)

Ms. Willis returned to Dr. Dib on February 14, 2022, complaining of severe and worsening cervical and back pain. (Tr. 464.) Dr. Dib referred her to physical therapy three times per week for 12 weeks. (Tr. 463.) An MRI of the cervical spine on February 25, 2022, showed mild degenerative disc disease in the lower cervical spine with mild narrowing of the spinal canal and anterior compression deformity of C4. (Tr. 515-16, 678-79.)

Chiropractic records from February and March 2022 indicate that Ms. Willis continued to report pain in the 5-7/10 range, as well as poor sleep and low endurance; but she missed two of four scheduled appointments during that time. (Tr. 533-34.) In a March 16, 2022 neck pain index report, she complained that her neck pain caused headaches "almost all the time,"

prevented her from reading, concentrating, engaging in recreational activities, and sleeping well, and caused pain while she engaged in personal care.  (Tr. 532.)

On March 30, 2022, at Dr. Krupko's referral, Ms. Willis presented for an initial consult with David Gutlove, M.D., at Mercy Pain Medicine Alliance.  (Tr. 653-57.)  She reported constant and persistent neck pain that radiated into her back and arms, describing the pain as burning, stabbing, sharp, and aching.  (Tr. 653.)  She rated her pain at 10/10 for the past week and said it interfered with her enjoyment of life and general activity.  (Tr. 654.)  Her physical examination revealed normal gait, 5/5 strength in upper extremities, decreased range of motion in cervical flexion and extension, tenderness to palpation along the paracervical shoulder and right cervical facet joint, and multiple trigger points and tender points.  (Tr. 656.)  Dr. Gutlove reviewed the x-rays and MRI from February 2022 and diagnosed cervical degenerative disc disease, cervical degenerative joint disease, cervical compression deformity C4, cervical pain, cervical radiculitis, lumbar degenerative disc disease, lumbar degenerative joint disease, lumbar facet arthropathy, lumbar facet syndrome, low back pain, intermittent lumbar radiculitis, chronic pain syndrome, and insomnia.  (*Id.*)  He prescribed trigger point injections.  (*Id.*)  Ms. Willis went on to receive trigger point injections in April, June, and November 2022.  (Tr. 662-67.)  She reported good benefit.  (Tr. 666.)

Ms. Willis returned to see Dr. Dib on July 13 and August 8, 2022, complaining of worsening constipation; Dr. Dib adjusted her Trulance prescription.  (Tr. 632-35.)  On October 12, 2022, Ms. Willis reported to Dr. Dib that she had tingling in her legs that was getting worse.  (Tr. 630-31.)  At a December 19, 2022 appointment that was focused on other symptoms, Ms. Willis denied fatigue or headaches.  (Tr. 696.)  She continued to deny, or at least not report, headaches into early 2023.  (Tr. 685 (denying headaches at a June 2023 appointment), 687 (same

in May 2023), 689 (same in April 2023), 691-92 (not reporting headaches in February 2023), 693-94 (same in January 2023).)

On April 4, 2023, at Dr. Dib's referral, Ms. Willis was seen at NeuroCare Canton for her migraine, paresthesia, headache, and bipolar disorder.  She reported daily headaches with no nausea and some light or sound sensitivity and said she "could not recall the last time she did not have a headache."  (Tr. 674.)  Andrew Stalker, M.D., found Ms. Willis alert with normal speech and language and assessed her with chronic daily headache and medication overuse headache. (*Id.*)  He prescribed a Medrol dose pack and ordered a brain MRI.  (*Id.*)  The MRI was conducted on April 14, 2023 and showed no abnormalities.  (Tr. 676).

On May 16, 2023, Ms. Willis attended a follow-up appointment at NeuroCare with Amita-Joshi, PA-C, at which she stated that the Medrol dose pack had somewhat reduced the frequency and intensity of her headaches, but that they still occurred daily and caused dizziness and lightheadedness.  (Tr. 670.)  On examination, PA-C Joshi found Ms. Willis fully oriented with normal speech.  (*Id.*)  She prescribed sumatriptan and propranolol.  (*Id.*)

### ii.    Mental Health Impairments

On August 17, 2020, Ms. Willis underwent an initial assessment with counselor Thomas Jones, Jr., LPCCS, at CommQuest counseling.  (Tr. 327-40.)  She sought counseling for depression and anxiety, reporting symptoms such as trouble concentrating, irritability, loss of energy, and poor motivation.  (Tr. 328-29.)  On examination, she was properly oriented; had a neat and clean appearance; exhibited good eye contact, normal motor activity and speech; had intact immediate, short-term, and long-term memory; and demonstrated an appropriate affect, depressed/anxious mood, cooperative attitude, logical thought processes, partial impulse control and judgment, and fair insight.  (Tr. 336.)

7

Ms. Willis underwent a psychiatric evaluation with Robert Parsons, CNP, at CommQuest on September 16, 2020.  (Tr. 341-47.)  CNP Parsons diagnosed: major depressive disorder, recurrent severe without psychotic features; GAD; and insomnia due to other mental disorder. (Tr. 341.)  Ms. Willis reported "constantly worrying," feeling overwhelmed at times, and suffering recurrent depression for seven to eight years.  (*Id.*)  She also noted that she had chronic back and joint pain and said she only slept three to four hours a night.  (*Id.*)  She said she was taking psychiatric medication, but it was not helping.  (*Id.*)  Mental status exam findings indicate that Ms. Willis: was dressed appropriately and casually groomed; was fully oriented and alert; spoke normally; appeared restless, talkative, and cooperative; had logical thought processes and associations, depressed mood, and appropriate affect; and had good memory, insight, judgment, and concentration.  (Tr. 343.)  CNP Parsons prescribed conservative doses of vortioxetine, citalopram, and zaleplon and recommended therapy.  (Tr. 343-44.)

Ms. Willis saw CNP Parsons again on October 6, 2020.  (Tr. 438-51.)  She was showing a good initial response to vortioxetine, reporting a stable mood, improved sleep, and mild depression and anxiety.  (Tr. 348.)  On examination, she was fully oriented and alert; had normal speech; was restless; had logical thought processes and associations; and had an anxious mood, appropriate affect, and good memory, insight, judgment, and concentration.  (Tr. 349.)  CNP Parsons increased her vortioxetine and discontinued citalopram.  (Tr. 350.)  At a December 1, 2020 follow-up with CNP Parsons, Ms. Willis's reported symptoms and mental status findings were unchanged.  (Tr. 352-53.)  No changes were made in her medications.  (Tr. 354.)

Ms. Willis testified that her insurance stopped paying for counseling, so she continued monitoring her mental health symptoms with Dr. Dib.  (*See* Tr. 55, 58.)  On April 1, 2021, Ms. Willis told Dr. Dib that she had little interest or pleasure in doing things, felt depressed and

8

hopeless nearly every day, had trouble sleeping, felt tired, had a poor appetite, and had trouble

concentrating.  (Tr. 480-81.)  Dr. Dib assessed her with moderately severe depression.  (Tr. 481.)

There are no recorded depression screenings for the rest of 2021.  (Tr. 467-74.)  Depression

screenings were negative on January 13, February 14, May 19, June 8, July 13, August 3,

November 29, December 9, and December 19, 2022.  (Tr. 463-64, 466, 632, 635, 636, 639, 696,

701-02, 700.)  On July 13, 2022, Ms. Willis complained of worsening bipolar symptoms and Dr.

Dib prescribed Vraylar.  (Tr. 634.)  Bipolar disorder was not mentioned again in treatment notes

except to continue Ms. Willis's medication.  (Tr. 691, 695.)  Depression screenings with Dr. Dib

continued to be negative on January 16, February 2, April 17, May 17, June 15, and July 18,

2023.  (Tr. 683, 685, 687, 689, 692, 693-94.)

> ## 2.    Opinion Evidence

> ### i.    Treating Source

Dr. Dib completed a Physical Medical Source Statement on August 28, 2023.  (Tr. 708-

11.)  She opined that Ms. Willis could: sit for 30 minutes before needing to get up; stand for 20-

30 minutes before needing to sit or walk around; and sit and stand/walk less than two hours in an

eight-hour workday.  (Tr. 709.)  She opined further that Ms. Willis: needed to walk around every

30 minutes for 7-15 minutes in an eight-hour workday; needed three or four 30-minute,

unscheduled breaks during a workday; and must use a cane while standing for imbalance, pain,

weakness, and dizziness but did not need it all the time.  (Tr. 709-10.)  She also opined that Ms.

Willis: could rarely lift less than ten pounds and never lift ten or more pounds; could reach her

arms in front of her body for 25% of an eight-hour workday and overhead for 20% of an eight-

hour workday; would be off task 25% or more of a workday; and was incapable of even "low

stress" work.  (Tr. 710.)  Finally, she opined that Ms. Willis would be absent from work more than four days per month and could never lift, push, or carry.  (Tr. 711.)

### ii. Consultative Examiners

#### a. Taylor Groneck, Psy. D.

On July 23, 2020, Ms. Willis underwent a consultative examination with Taylor Groneck, Psy. D.  (Tr. 317-23.)  Ms. Willis told Dr. Groneck she drank three days a week to "cope with things" but denied illicit drug use.  (Tr. 317.)  She was taking Topamax, thyroid medicine, and citalopram.  (*Id.*)  She had never been hospitalized for psychiatric reasons.  (*Id.*)  She denied suicidal or homicidal ideation or having ever attempted suicide.  (*Id.*)

Regarding her depressive symptoms, Ms. Willis said she had low energy, feelings of decreased self-worth, problems concentrating, poor appetite, and insomnia.  (Tr. 319.)  Regarding her anxiety, she stated: "it's bad."  (*Id.*)  She said her heart raced constantly, and she would sweat and feel like she was overheating.  (*Id.*)

Ms. Willis had last worked in March 2020, caring for the elderly.  (*Id.*)  She said the biggest difficulty doing her job now would be the "physical stuff" (helping her patients get around, bathing them) and having to remind patients to take their medications.  (*Id.*)

On a typical day, Ms. Willis said she usually stayed in bed watching television or sleeping.  (*Id.*)  She did not eat much except saltine crackers or bread and peanut butter that she bought at the Dollar Store.  (*Id.*)  She could pay bills, drive, do laundry, and complete limited household chores.  (*Id.*)  She was not motivated to cook, and usually used paper plates to avoid needing to do dishes.  (*Id.*)  Her daughter sometimes brought her food.  (*Id.*)  Ms. Willis visited with family members but did not visit with friends and denied current interests or hobbies.  (*Id.*)

During the evaluation, Ms. Willis was cooperative, adequately groomed, and adequately motivated to participate.  (Tr. 319-20.)  She appeared to understand the purpose of the evaluation and did not seem to minimize or exaggerate her difficulties.  (Tr. 320.)  She spoke softly, but her speech was not pressured or slow, her receptive language skills were adequate, and her thoughts were goal oriented.  (*Id.*)  Her verbal expressive abilities seemed under-developed for her age, and her phraseology, grammatical structure, and vocabulary suggested she was of low average to average intelligence.  (*Id.*)  She appeared depressed, with a blunted affect, mostly sad facial expression, low energy, slow psychomotor speed, and variable eye contact.  (*Id.*)  She appeared nervous but displayed no indication of obsessions, compulsions, excessive religiosity, somatization, misinterpretations, suspiciousness, paranoid ideation, delusions, or hallucinations. (*Id.*)  She was fully oriented, displayed adequate recent and remote recall but limited short term and working memory, recalling five digits forward but only three backwards.  (*Id.*)  Her attention and concentration were limited, as she asked for questions to be repeated.  (*Id.*)  She could not explain the similarity between two objects and incorrectly identified the number of weeks in a year; but she could name the president of the United States and correctly interpret a simple aphorism.  (*Id.*)  She appeared adequately able to understand her abilities and limitations, make decisions about her future, and conduct her own living arrangements.  (*Id.*)

Dr. Gorneck diagnosed Ms. Willis with unspecified bipolar disorder and GAD.  (Tr. 321.) She also provided a functional assessment of Ms. Willis's mental abilities in the four categories of mental functioning, as follows.  (Tr. 321-22.)  With respect to understanding, remembering, and carrying out instructions, she opined that Ms. Willis "may struggle to retain complex and multi-step job instructions" since "her short-term memory and working memory abilities were limited" and she "indicated noticing more recent problems with her memory in terms of

11

forgetfulness." (Tr. 321.)  With respect to maintaining attention, concentration, persistence, and pace, Dr. Groneck opined that Ms. Willis's ability to focus and concentrate was limited, and she was "likely to become distracted by negative thoughts and worry, which will likely impact her ability to work at a reasonably productive pace." (Tr. 321-22.)  With respect to responding appropriately to supervision and coworkers in a work setting, Dr. Groneck opined that Ms. Willis "may have problems initiating and maintaining productive work relationships" because of mood symptoms. (Tr. 322.)  With respect to responding appropriately to work pressures, Dr. Groneck opined that Ms. Willis would "likely struggle to think quickly on her feet" and was "expected to feel overwhelmed with tasks requiring rapid and timed performance," and that "[e]xposure to workplace pressures [wa]s likely to exacerbate current mood symptoms." (*Id.*)

### b.    Carolyn Arnold, Psy. D.

Ms. Willis underwent a consultative examination with Carolyn Arnold, Psy. D., on July 27, 2022. (Tr. 625-29.)  She reported being diagnosed with depression and anxiety ten years prior and with bipolar disorder two weeks prior. (Tr. 626.)  She endorsed symptoms of feeling easily angered, racing heart, headaches, fatigue, crying constantly, low motivation, and staying in bed most of the time. (*Id.*)  She said counseling and medication had been helpful and denied using illicit drugs, excessive alcohol, or tobacco. (*Id.*)

During the evaluation, Ms. Willis was well-groomed, cooperative, and fully oriented; described her mood as variable and down; had a congruent affect; did not report hallucinations, delusions, or suicidal ideation but said she sometimes felt it would be better not to wake up; and could recall three of three words after five minutes, five of six digits forward, and five of six digits backwards. (Tr. 627.)  She sometimes needed questions repeated but was able to calculate Serial 7s from 100 to 86, correctly spelled "world" backwards and forward, followed a three-step

12

command, and understood all instructions given. (*Id.*) Her abstract thinking was intact, and her insight into her condition and life situation was realistic. (*Id.*)

Dr. Arnold diagnosed Ms. Willis with bipolar disorder, depression, and anxiety. (Tr. 628.) She found her prognosis was fair and could be improved by supportive counseling. (*Id.*) She summarized "functional information" regarding Ms. Willis, which appears primarily to be self-reported. (Tr. 628.) As to understanding, remembering, and carrying out instructions, she said Ms. Willis was able to understand instructions, remember, and apply information, but experienced brain fog in the form of losing track mid-task, sentence, or conversation, forgetting, and feeling overwhelmed by information or obligations, but did not experience actual confusion. (*Id.*) As to maintaining attention, concentration, persistence, and pace, she said Ms. Willis could "sustain concentration and show persistence for up to an hour or more while sleeping, watching tv and laying in bed" and could "do few activities in timely manner and at a reasonable pace." (*Id.*) As to social functioning, she said Ms. Willis tended to self-isolate, but spent time with her friend and daughter and could "tolerate these interactions for up to an hour or more." (*Id.*) As to deterioration or decompensation, she said Ms. Willis had "a reduced ability to work and do most physical activities," a "reduced tolerance for loud noise," and "low motivation." (*Id.*)

Dr. Arnold also included a "functional assessment" with the following findings:

> The claimant can understand, remember and carry out instructions, follow a conversation and can think abstractly and apply reason when asked to interpret proverbs. The claimant's short term memory was largely intact as evidenced by accurate recall of three of three words and five of six digits forward immediately. Long term memory was intact as evidenced by the recall of three of the three words after a few minutes and the recall of a personal memory. Mental flexibility was less intact as evidenced by the recall of five of six numbers on Digit Span backward, spelling "world" correctly both backward and forward and exhibiting a relatively weak fund of knowledge.

> The claimant was able to sustain concentration and show persistence with simple tasks for a moderate period of time and multistep tasks for a short period of time.

The claimant was distractible and fatigued as evidenced by the performance on the Serial 7s task.

The claimant has limited social interactions, mostly with her friend and daughter. The claimant reported less difficulty with social interactions in the past, especially 20 years ago when she was married and has progressively become less social and less caring about life, a history of sometimes interacting well with co-workers and supervisors but often feeling uncomfortable and aggravated by other people and responding somewhat adequately to workplace pressures by talking to her boss and taking many days off. The claimant has adapted to limitations by remaining at home, self-isolating and adjusting activities. The reported plan for the future is "I don't have no plans for the future."

(Tr. 629.)

### iii.    State Agency Reviewing Physicians

On May 5, 2022, state agency medical consultant Abraham Mikalov, M.D., completed a physical RFC assessment.  (Tr. 81-82, 92-93.)  Dr. Mikalov opined that Ms. Willis had the RFC to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.  (Tr. 81, 92.)  Dr. Mikalov opined that Ms. Willis had no postural, manipulative, visual, communication or environmental limitations.  (*Id.*)  Upon reconsideration on December 8, 2022, state agency medical consultant Mehr Siddiqui, M.D., affirmed Dr. Mikalov's findings.  (Tr. 104-05, 113-14.)

On August 13, 2022, state agency psychological consultant Jennifer Swain, completed a Psychiatric Review Technique ("PRT") (Tr. 78-79, 89-90) and Mental RFC Assessment (Tr. 82-83, 93-94).  In the PRT, Ms. Swain found that Ms. Willis had: mild limitations in her ability to understand, remember, or apply information and to interact with others; and moderate limitations in her ability to adapt or manage oneself and concentrate, persist or maintain pace.  (Tr. 79, 89.)  In the mental RFC, Ms. Swain opined that Ms. Willis could perform routine tasks in an environment where changes are explained in advance.  (Tr. 82-83, 93-94.)  Upon

reconsideration, on November 28, 2022, state agency psychological consultant Audrey Todd, Ph.D., affirmed Ms. Swain's opinions.  (Tr. 102-03, 105-06, 111-12, 114-16.)

### C.  Hearing Testimony

#### 1.  Plaintiff's Testimony

At the hearing on September 19, 2023, Ms. Willis testified in response to questioning by her attorney and the ALJ.  (Tr. 34-73.)  Ms. Willis testified that she had lived with a friend at her current address for about ten years.  (Tr. 41-42.)  When her friend was at work, Ms. Willis's daughter came throughout the week to help Ms. Willis do things like get dressed and do day-to-day chores Ms. Willis could not do, like laundry, dishes, and cooking.  (Tr. 42-43.)  Ms. Willis confirmed she could dress and bathe herself.  (Tr. 42.)

Ms. Willis said she did not drive much because turning her head to watch for traffic was difficult due to neck pain.  (Tr. 61.)  When she drove, she often got lost because she had "no sense of direction" and would forget where she was going and become confused.  (*Id.*)  She could drive herself to doctor's appointments and drive to the store for one or two items if her daughter was unavailable to drive.  (Tr. 43.)  Her daughter completed the weekly or bi-weekly grocery shopping.  (*Id.*)  Ms. Willis accompanied her daughter on these shopping trips less than half the time.  (Tr. 43-44.)  If she did not accompany her daughter, she wrote a grocery list, which she was able to do herself in a few seconds.  (Tr. 43-44, 60.)  Ms. Willis spent a typical day in her bedroom listening to music, watching TV, or napping.  (Tr. 56.)  She slept about six hours a night.  (*Id.*)

Ms. Willis testified she was prevented from working by her back, her neck, depression, and migraines.  (Tr. 48.)  Regarding her back, she dealt with pain in her lower back that radiated down her right leg to the back of her knee.  (Tr. 49.)  Due to this pain, she could only stand about

30 minutes before sitting down and walk about 20 yards before needing a break.  (*Id.*)  Ms. Willis had been using a cane for two to three months before the hearing at her doctor's suggestion.  (*Id.*)  Her doctor told her to get a cane but did not actually prescribe one.  (Tr. 49-50.)  Ms. Willis's use of the cane depended on the day and what she was doing.  (Tr. 50.)  She typically took it to her doctor's appointments.  (*Id.*)

Regarding her neck, Ms. Willis testified her neck pain radiated down both arms into her hands.  (Tr. 50.)  This pain impacted her ability to do things like reach overhead to wash her hair or put on a T-shirt.  (*Id.*)  She could do these things sometimes, but most of the time her daughter helped her.  (Tr. 50-51.)  Ms. Willis could reach for and grab a light box of cereal from the top shelf at the grocery store.  (Tr. 51.)  She could not pick up a gallon of milk with one hand but could pick up a half-gallon.  (*Id.*)  She sometimes dropped things, like her coffee cup, due to pain in her neck and arms.  (Tr. 59.)

Regarding her depression and anxiety, Ms. Willis testified she had undergone counseling over a year before the hearing, but her insurance stopped paying for it.  (Tr. 55, 58.)  She had never been hospitalized overnight for depression or anxiety.  (Tr. 55.)  She had crying spells "all the time" due to her depression and had panic attacks three times a week due to her anxiety.  (*Id.*)  Her panic attacks usually lasted half an hour, and they came on their own, without triggers.  (Tr. 55-56.)  Ms. Willis also experienced symptoms of mood swings, irritability, and short and long-term memory loss due to her anxiety and depression.  (Tr. 56.)

Regarding her headaches, Ms. Willis testified she had a level-ten migraine headache every day.  (Tr. 53-54.)  She was currently experiencing a level-ten headache (Tr. 54) and could not remember the last day she did not have a headache (Tr. 57).  Her headaches would usually last all day or would come and go.  (*Id.*)

16

Ms. Willis also testified she had an IBS attack every day, which caused her to have to go to the bathroom three times a day. (Tr. 59.) She had come close to having an accident, but she did not wear Depends or anything similar. (*Id.*)

Dr. Dib was Ms. Willis's primary care physician and treated her for back and neck pain, depression and anxiety, and IBS. (Tr. 58.) She saw her about four times a month. (*Id.*)

To treat her back and neck pain, Ms. Willis took muscle relaxers, received cortisone injections, and had undergone physical therapy. (Tr. 51.) She received the injections every four weeks but did not find they provided relief. (Tr. 51-52.) She last attended physical therapy maybe a year before the hearing. (Tr. 52.) She did not obtain relief from therapy but continued to do the exercises and stretches the therapist gave her at home a couple days a week for five minutes. (*Id.*) Besides muscle relaxers, Ms. Willis treated her pain with Aspercreme and Icy Hot. (Tr. 52-53.) To treat her headaches, Ms. Willis would lie in her room and cover her head with a pillow. (Tr. 54-55.) She also saw a neurologist who prescribed headache medication. (Tr. 57.) He had recently started her on new medication because the previous medication was not working. (*Id.*) He had not suggested more aggressive treatment, such as Botox injections. (*Id.*) The new medication was not working either, but Ms. Willis had not yet had a chance to tell her neurologist. (Tr. 58.) Ms. Willis also took medication to treat depression/bipolar disorder, anxiety, sleep, and IBS. (Tr. 53.) Becoming tired and a little lightheaded was a side effect of one of her medications, but she did not identify which one. (*Id.*) Her daughter reminded her to take her medication. (Tr. 55.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC

determination could not perform Ms. Willis's prior work, but could perform representative positions in the national economy, including mail sorter, merchandise marker, and routing clerk. (Tr. 64-65.)  If reaching or handling with the bilateral upper extremities was reduced to occasional, it would be work preclusive.  (Tr. 66.)

The VE further testified that a hypothetical individual under 50 with Plaintiff's education and work experience and a limitation to sedentary work, with the additional functional limitations described in the ALJ's RFC determination, could perform positions in the national economy that included addresser, document preparer, and printed circuit board assembly screener.  (Tr. 66-67.)  Again, reducing handling or reaching with the bilateral upper extremities to occasional would be work preclusive.  (Tr. 67.)

The VE also testified that a limitation to occasional interaction with supervisors and no interaction with coworkers or the general public would be work preclusive.  (Tr. 67-68.)  If an individual needed occasional redirection or extra supervision to stay on task outside a 30-90-day introductory period, that would also be work-preclusive.  (Tr. 68.)  If the individual would either be off task over 14% of the workday or absent more than one and a half days per month, that would preclude competitive employment.  (Tr. 68-69.)  The individual could take no more than three, five-minute unscheduled breaks to get water or go to the restroom in unskilled or semiskilled positions.  (Tr. 69.)  If the individual needed to take three 30-minute breaks in addition to their regularly scheduled breaks, that would be work-preclusive.  (Tr. 71.)  If the individual needed a cane for balance, it would be work preclusive.  (Tr. 70.)  If the individual could sit for less than two hours or walk/stand for less than two hours, it would be work preclusive.  (Tr. 71.)  Additionally, if the individual needed to lay down in a dark room for one hour a day twice a week, that would be work preclusive in unskilled and semiskilled work.  (*Id.*)

18

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520[1]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this
sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters
v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the
Commissioner at Step Five to establish whether the claimant has the Residual Functional
Capacity ("RFC") and vocational factors to perform other work available in the national
economy.  *Id.*

## IV.   The ALJ's Decision

In his October 3, 2023 decision, the ALJ made the following findings:[2]

1.   The claimant meets the insured status requirements of the Social Security
     Act through December 31, 2024.  (Tr. 20.)

2.   The claimant has not engaged in substantial gainful activity since March
     5, 2020, the alleged onset date.  (*Id.*)

3.   The claimant has the following severe impairments: cervical degenerative
     disc disease and compression deformity with radiculitis, lumbar
     degenerative disc disease with radiculitis, headache and migraine, bipolar
     disorder, depressive disorder, and anxiety disorder.  (*Id.*)

4.   The claimant does not have an impairment or combination of impairments
     that meets or medically equals the severity of the listed impairments in 20
     C.F.R. Part 404, Subpart P, Appendix 1.  (Tr 21.)

5.   The claimant has the residual functional capacity to perform sedentary
     work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except: she can
     never climb ladders, ropes or scaffolds. She can occasionally crouch,
     crawl, stoop, and climb ramps and stairs. The claimant can frequently kneel
     and balance. She can frequently reach and handle with the bilateral upper
     extremities. She can have occasional exposure to loud noise and bright
     lights (defined as "brighter than a typical office setting") and avoid all
     exposure to hazards such as unprotected heights, dangerous moving
     mechanical parts, and commercial driving. The claimant can perform

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances,
citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations
found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq.,
corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. §
416.920).

[2] The ALJ's findings are summarized.

simple, routine, and repetitive tasks, but cannot perform tasks that require a high production rate pace (such as assembly line work). She can interact on an occasional basis with supervisors, coworkers, and the general public. She can respond appropriately to occasional change in a routine work setting.  (Tr. 22.)

6.     The claimant is unable to perform any past relevant work.  (Tr. 26.)

7.     The claimant was born in 1971 and was 48 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  (*Id.*)

8.     The claimant has at least a high school education.  (*Id.*)

9.     Transferability of job skills is not material to the determination of disability.  (Tr. 27.)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including mail sorter, merchandise marker, and routing clerk.  (*Id.*)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 5, 2020, through the date of the decision on October 3, 2023.  (Tr. 27-28.)

## V.     Plaintiff's Arguments

Plaintiff presents three assignments of error.  First, she argues that the ALJ failed to properly evaluate her headaches at Step Three of the sequential evaluation.  (ECF Doc. 7, pp. 1, 10-14.)  Secondly, she argues the ALJ erred when he failed to incorporate the limitations set forth in the medical opinions of her treating physician and the consultative examiners, and to support his conclusions with substantial evidence.  (*Id.* at pp. 1, 14-21.)  Finally, she argues the ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of Plaintiff's symptoms precluded her from engaging in substantial gainful activity.  (*Id.* at pp. 21-24.)

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th

Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a

zone of choice within which the decisionmakers can go either way, without interference by the

courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.** **First Assignment of Error: The ALJ Properly Evaluated Plaintiff's Headaches at Step Three of the Sequential Evaluation**

In her first assignment of error, Ms. Willis argues that the ALJ's disability determination lacks the support of substantial evidence because the ALJ did not properly evaluate her migraine headaches at Step Three under Listing 11.02B and Social Security Regulation ("SSR") 19-4p. (ECF Doc. 7, pp. 10-14; ECF Doc. 10.) Specifically, she argues that the ALJ incorrectly found "the evidence did not show severe consistent migraines that caused signs and limitations detailed in listing 11.02" (ECF Doc. 7, p. 10 (quoting Tr. 21)) and that he erred "when he failed to find that the treatment notes and testimony satisfied all the elements of [SSR 19-4p]," (*id.* at p. 12).[3]

---

[3] Ms. Willis also makes the conclusory assertions that the ALJ "failed to analyze Plaintiff's headaches throughout the sequential evaluation" (ECF Doc. 7, p. 12) and "erred when he failed to discuss any effects the headaches would have on [her] ability to engage in substantial gainful activity on a full-time and sustained basis" (*id.*). The undersigned finds these arguments were inadequately developed and therefore waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

In response, the Commissioner argues that substantial evidence supports the ALJ's evaluation of Ms. Willis's headaches. (ECF Doc. 9, pp. 8-11.) In particular, the Commissioner argues that Ms. Willis cannot show her headaches medically equal Listing 11.02 due to the lack of a prior administrative medical finding or medical expert testimony supporting medical equivalence under SSR 17-2p and that Ms. Willis has not otherwise met her burden to prove that she medically equaled a listing. (*Id.*) Ms. Willis replies that SSR 17-2p is inapplicable, and the record supports a finding that her headaches medically equal Listing 11.02. (ECF Doc. 10, p. 3.)

### 1.   Legal Framework for Step Three Evaluation of Headaches

At Step Three of the disability evaluation, a claimant is disabled if her impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)). The claimant bears the burden to prove that her condition meets or equals a listing. *See* 20 C.F.R. § 404.1520(d); *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)). To do so, she "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

While there is no listing for headaches, SSR 19-4p provides guidance on how "primary headache disorders" such as migraines are established and evaluated, explaining: "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing." SSR 19-4p, 84 Fed. Reg. 44667,

44667-71 (Aug 26, 2019).  While a claimant cannot "meet" a listing for headache—as no such listing exists—her headaches could "medically equal" Listing 11.02 for epilepsy.  *Id.*  SSR 19-4p further addresses the application of Paragraph B of Listing 11.02 to headaches as follows:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

(*Id.*)

To meet her burden to show that an impairment medically equals a listing, Ms. Willis must prove that "the findings related to [the] impairment(s) [were] at least of equal medical significance to those of a listed impairment."  20 C.F.R. § 404.1526(b)(2).  Further, before an ALJ can find she medically equals a listing, the record "must" contain one of the following:

1. A prior administrative medical finding from [a state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3. A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

SSR 17-2p, 82 Fed. Reg. 15263, 15265 (March 27, 2017).  Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert.  *Id.*  And if the ALJ "believes the evidence

does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not obtain medical expert evidence, and in fact need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

### 2.     The ALJ Appropriately Evaluated Plaintiff's Migraine Headaches

The ALJ identified migraine headaches as a severe impairment at Step Two (Tr. 20) but found Ms. Willis's impairments did not medically equal Listing 11.02 at Step Three, explaining:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching such conclusion, I considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(f), 416.927(f)). I considered all relevant listings in reaching this finding, with specific emphasis on listings 1.15, 1.16, 11.02, 12.04, and 12.06. . . . With respect to listing 11.02, I considered such listing for the claimant's migraines consistent with SSR 19-4p. However, the evidence did not show severe consistent migraines that caused signs and limitations detailed in listing 11.02.

(Tr. 21.)  Plaintiff contends that this finding was in error because the ALJ failed to adequately discuss the medical evidence in relation to SSR 19-4p and because the evidence indicates she had headaches once per week.  (ECF Doc. 7, pp. 11-13.)

Before turning to these arguments, the undersigned addresses Ms. Willis's contention that SSR 17-2p does not apply to the ALJ's consideration of whether her headaches medically equal Listing 11.02, which she asserts is governed only by SSR 19-4p.  (ECF Doc. 10, p. 3.)  This assumption appears to undergird her other arguments, as application of SSR 17-2p to the facts of this case makes abundantly clear that the ALJ did not err in his Step Three finding regarding Plaintiff's headaches.

SSR 19-4p provides: "Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in

combination with another impairment(s), medically equals a listing." SSR 19-4p, 84 Fed. Reg. at 44670-71. But the language in SSR 19-4p simply outlines the mechanism through which a "medically equals" finding may be reached for a primary headache disorder. There is nothing in SSR 19-4p's language that exempts such medical equivalence findings from the requirements of SSR 17-2p, which applies to all medial equivalence determinations. SSR 17-2p, 82 Fed. Reg. 15263. Ms. Willis cites no authority for her assertion to the contrary. SSR 17-2p clearly states that the evidentiary record "must" contain a finding of medical equivalence by a state agency consultant at the initial or reconsideration level or a medical expert at the hearing level before an ALJ may find that a claimant medically equals a listing. *Id.* at 15265.

Here, Ms. Willis points to no medical expert testimony or prior agency determination that would support a finding her headaches medically equal Listing 11.02. Indeed, the ALJ noted that the state agency medical consultants did not find Plaintiff's impairments medically equal any listing before finding that the record "did not show severe consistent migraines that caused signs and limitations detailed in Listing 11.02." (Tr. 21.) These observations and findings were both accurate and consistent with the requirements of SSR 17-2p and SSR 19-4p.

As the requirements of SSR 17-2p were clearly not met in this case, Plaintiff's argument that the ALJ erroneously found insufficient evidence to support a medical equivalency finding under SSR 19-4p must fail. As discussed, the ALJ was precluded from finding medical equivalency in the absence of a similar finding made by a state agency consultant at the initial or reconsideration level or a medical expert at the hearing level. SSR 17-2p, 82 Fed. Reg. 15265.

Moreover, the ALJ did not err in finding that the evidence did not satisfy the requirements of SSR 19-4p. While Ms. Willis cites to records indicating she complained of headaches to her providers and testified to very frequent headaches (ECF Doc. 7, pp. 10-11), she

27

does not identify records showing, e.g., a "detailed description from an [acceptable medical source] of a typical headache event" or medical records establishing that her headaches met frequency requirements "despite adherence to prescribed treatment." SSR 19-4p, 84 Fed. Reg. at 44671. Thus, she has not shown the ALJ erred by finding that her headaches do not medically equal Listing 11.02 under SSR 19-4p.

Ms. Willis's more specific arguments that the ALJ failed to discuss the criteria of SSR 19-4p and/or the frequency of the migraines under Listing 11.02B are unpersuasive. (ECF Doc. 7, pp. 11-13.) Since the ALJ found that the evidence did not support a medical equivalence finding, he was not required to "articulate specific evidence supporting his . . . finding" that the impairments did not medically equal Listing 11.02. *See* SSR 17-2p, 82 Fed. Reg. at 15265.

Additionally, the ALJ "made sufficient factual findings elsewhere in his decision to support his conclusion[s] at step three." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). At Step Four, he provided a detailed discussion of Ms. Willis's migraine headaches, where he noted her "intermittent complaints of such conditions" (Tr. 26), unremarkable diagnostic scans, imaging, and clinical exams (Tr. 23-24), and recent clinical notes indicating some improvement with a new medication regimen (Tr. 24). Plaintiff insists that she "satisfied the requisite frequency criteria as her headaches occurred more than once per week," and the ALJ erred by finding otherwise. (ECF Doc. 7, p. 11.) However, the ALJ found elsewhere in his decision that her medical records "did not document the frequent debilitating headaches she described throughout the relevant period." (Tr. 26.) A review of the relevant records shows that Ms. Willis sometimes reported severe headaches to her medical providers, especially earlier in the relevant period (*see* Tr. 453, 486, 492-93, 567-68, 674), but also denied or failed to mention headaches at other appointments (*see* Tr. 465, 467, 471, 685, 687, 689, 691-

28

92, 693-94, 696).  Accordingly, the ALJ's finding that "the evidence did not show severe consistent migraines that caused signs and limitations detailed in listing 11.02" is supported by substantial evidence.  (Tr. 21.)

For the reasons set forth above, the Court finds the ALJ appropriately addressed medical equivalence as to migraine headaches under Listing 11.02 in accordance with the regulatory requirements and that Ms. Willis has not met her burden to demonstrate otherwise.  Accordingly, the undersigned finds that the first assignment of error lacks merit.

## C.   Second Assignment of Error: The ALJ Appropriately Evaluated the Medical Opinions of Plaintiff's Treating and Examining Sources

In her second assignment of error, Plaintiff argues that the ALJ erred in his evaluation of three medical opinions: that of treating physician Dr. Dib and those of consultative examiners Dr. Groneck and Dr. Arnold.  (ECF Doc. 7, pp. 14-21.)  Specifically, she argues that the ALJ erred by not finding Dr. Dib's opinion persuasive and not incorporating her opined limitations into the RFC (*id.* at pp. 16-18, 20-21), and by finding Dr. Groneck's and Dr. Arnold's opinions persuasive but not incorporating their opined limitations into the RFC (*id.* at pp. 19-21).  The Commissioner responds that the ALJ did not err in his evaluation of these medical opinions or his adoption of related RFC limitations.  (ECF Doc. 9, pp. 11-15.)

### 1.   Framework for Evaluating Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The most important factors

29

are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated her reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

**2.     The ALJ Adequately Articulated How He Evaluated Dr. Dib's Opinion and His Persuasiveness Finding was Supported by Substantial Evidence**

The ALJ evaluated Dr. Dib's medical opinion as follows:

Dr. Dib said that the claimant had severe persistent back and neck pain that limited her to sitting for 30 minutes at a time, standing for 20-30 minutes at a time, and sitting and standing/walking for less than two hours at a time, each (19F/2). According to Dr. Dib, the claimant would need unscheduled breaks, she required use of a cane for standing, and she could rarely lift less than 10 pounds (19F/3). Dr. Dib noted that the claimant would be off task 25% or more of the workday and she was incapable of even low stress work (19F/3). Dr. Dib concluded that the claimant would miss more than four days of work per month (19F/4). I find Dr. Dib's opinion unpersuasive. While she treated the claimant, the evidence failed to establish the extreme degree of limitations that Dr. Dib described. Indeed, while the evidence showed headaches and spinal pain with some extremity numbness, the treatment notes did not show such significant problems standing, walking, or sitting. Likewise, there was no evidence of the ongoing need for a cane to stand. Additionally, the claimant did not exhibit such significant stress reactions or such severe difficulty remaining on task.

(Tr. 25-26 (emphasis added).)

In challenging the above persuasiveness finding, Ms. Willis asserts that the ALJ made an "incorrect statement" when he said her "'treatment notes did not show such significant problems with standing, walking, or sitting,'" and argues the ALJ failed to cite evidence to support this "erroneous conclusion."  (ECF Doc. 7, p. 16 (quoting Tr. 25-26); *see id.* at p. 18.)  Without explaining how the ALJ's findings were "incorrect," Plaintiff copies and pastes her prior summary of the medical evidence and subjective complaints.  (*See id.* at pp. 16-18; *compare id.* at pp. 3-6.)  She does specifically assert that the ALJ "cited to the chiropractic records which indicated that Plaintiff had limited ability to lift and perform functional tasks," instead of citing to evidence that supported his findings.  (*Id.* at p. 19 (citing Tr. 25).)[4]  The Commissioner argues in response that the ALJ adequately articulated how he considered the persuasiveness of the opinion and that his findings were supported by substantial evidence.  (ECF Doc. 9, pp. 11-13.)

---

[4] Plaintiff also makes the conclusory assertion that the ALJ "erred when he based his RFC on the opinion of the reviewing sources who opined that Plaintiff could perform work at the light level of exertion despite her ongoing physical conditions."  (ECF Doc. 7, p. 18 (citing Tr. 25).)  To the extent Plaintiff is challenging the ALJ's evaluation of the state agency reviewing physicians, the undersigned finds this argument is inadequately developed and therefore waived.  *See McPherson*, 125 F.3d at 995-96.

In order to articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curium)).  An ALJ is also permitted to rely on previously articulated information to support her opinion analysis. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest*, 591 F. App'x at 366); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Here, the ALJ discussed Plaintiff's underlying medical records in detail (Tr. 23-25) before concluding that the treatment notes did not support the "significant problems standing, walking, or sitting" described in Dr. Dib's medical opinion—which limited Ms. Willis to "sitting for 30 minutes at a time, standing for 20-30 minutes at a time, and sitting and standing/walking for less than two hours at a time" (Tr. 25-26).  Specifically, the ALJ highlighted: Plaintiff's reports of back and neck pain, numbness and tingling in her arms, and severe headaches (Tr. 23-24); a brain MRI revealing a mild prominence of the optic nerves sheath (Tr. 23 (citing Tr. 527)); a prescription for Topamax (*id.* (citing Tr. 492)); participation in physical therapy for back and neck pain (*id.* (citing Tr. 542-624)); a normal upper extremity EMG, but with a positive impingement test on examination (Tr. 24 (citing Tr. 450)); a cervical MRI showing mild degenerative disc disease in the cervical spine (*id.* (citing Tr. 679)); trigger point injections (*id.* (citing Tr. 666)); physical examinations with some tenderness and trigger points, reduced range

of motion, and decreased reflexes, but normal strength and gait in the lower extremities (*id.* (citing Tr. 455, 56, 678)); a normal brain MRI (*id.* (citing Tr. 676)); and reported improvement in headaches with a Medrol dose pack (*id.* (citing Tr. 670)).  This summary of the evidence largely tracks with the evidence highlighted in Plaintiff's brief, and Plaintiff has not identified specific evidence that the ALJ mischaracterized or failed to address. (*See* ECF Doc. 7, pp. 15-18.)

Considering the evidence specifically identified and discussed by the ALJ, the undersigned concludes that the ALJ adequately explained and cited evidence to support his findings that "the evidence showed headaches and spinal pain with some extremity numbness" but that the treatment notes did not support the "significant problems standing, walking, or sitting" described in Dr. Dib's opinion.  (Tr. 25-26.)  The ALJ was not required to repeat his earlier discussion of the medical evidence in his opinion analysis.  *See Crum*, 660 F. App'x at 457; *Bledsoe*, 165 F. App'x at 411.  Accordingly, Plaintiff's argument that the ALJ failed to explain or cite to records in support of his persuasiveness analysis must fail.

Plaintiff's additional argument that the ALJ "cited to the chiropractic records which indicated the Plaintiff had limited ability to lift and perform functional tasks" does not alter this analysis.  (*See* ECF Doc. 7, p. 18 (citing Tr. 25).)  First, the ALJ specifically observed that the assertions in the chiropractic records regarding Plaintiff's "limited ability to lift and perform functional tasks . . . appeared to be the [Plaintiff]'s subjective allegations rather than the assessment of a medical source," and found that "the evidence did not document such severe limitations and thus such assessment would be unpersuasive in any event."  (Tr. 25 (citing Tr. 532-41).)  Second, even if those records are suggestive of some limitations, Plaintiff has not shown that the records deprived the ALJ of substantial evidence to support his persuasiveness finding with respect to Dr. Dib's medical opinion.  Ultimately, the substantial evidence standard

provides for a "'zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545). Regardless of whether substantial evidence might support Plaintiff's preferred persuasiveness finding, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

For the foregoing reasons, the undersigned finds that the ALJ adequately articulated his reasons for finding Dr. Dib's medical opinion unpersuasive, and that his findings were supported by substantial evidence.

### 3. The ALJ Did Not Err by Failing to Incorporate Specific Limitations From the Medical Opinions of the Consultative Examiners

Ms. Willis contends that the ALJ erred by not including limitations from the medical opinions of Drs. Groneck and Arnold in the RFC, despite finding both opinions persuasive. (ECF Doc. 7, p. 19.)   She also asserts that the RFC was not supported by substantial evidence because it did not include "these supported and consistent opined limitations." (*Id.* at p. 21.) The Commissioner responds that the ALJ did incorporate limitations in the RFC that accounted for the limitations opined by the consultative examiners. (ECF Doc. 9, pp. 13-15.)

An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1); *see also* 20 C.F.R. § 416.9546(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."). Although an ALJ must determine the RFC based on the relevant evidence in the record, including medical opinion evidence, he is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe*, 342 F. App'x at 157; *see* 20

C.F.R. §§ 416.945(a)(1), 416.946(c).  Indeed, even where an opinion has been given great

weight, "there is no requirement that an ALJ adopt a state agency psychologist's opinions

verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."

*Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

The ALJ found both Dr. Groneck and Dr. Arnold's opinions persuasive but noted that Dr.

Arnold's opinion was "vague" and contained "little description of specific functional abilities or

limitations.  (Tr. 24-25.)  The two medical opinions are discussed in turn below.

### i.      Consultative Examiner Taylor Groneck, Psy.D.

The ALJ evaluated Dr. Groneck's medical opinion as follows:

> Dr. Groneck opined that the claimant would struggle to retain complex and multi-step instructions, she had limited focus, and she would have difficulty with maintaining a productive pace, she would have trouble maintaining work relationships, and pressure would likely exacerbate her mental symptoms. I find Dr. Groneck's opinion persuasive. She examined the claimant and based her conclusions on the objective findings. Moreover, the evidence as a whole generally confirmed her conclusions.

(Tr. 24 (emphasis added).)  Ms. Willis asserts, without further explanation, that the ALJ

"erroneously failed to include the opined limitations in his RFC."  (ECF Doc. 7, p. 19.)

Setting aside Plaintiff's failure to appropriately develop this argument, a review of the

evidence and the ALJ's written decision reveal that the ALJ adopted mental RFC limitations that

corresponded with Dr. Groneck's medical opinion findings.  As to understanding, remembering,

and carrying out instructions, Dr. Groneck noted that Ms. Willis had no difficulty understanding

questions but had "limited" short-term and working memory abilities, and opined that she "may

struggle to retain complex and multi-step instructions."  (Tr. 321.)  Consistent with these

findings, the ALJ adopted an RFC finding her able to perform "simple, routine, and repetitive

tasks."  (Tr. 22.)  As to maintaining attention, concentration, persistence, and pace, Dr. Groneck

noted that Ms. Willis had a "limited" ability to focus and concentrate and opined that she was

35

"likely to become distracted by negative thoughts and worry, which w[ould] likely impact her ability to work at a reasonably productive pace." (Tr. 321-22.)  The ALJ adopted an RFC that found she could not "perform tasks that require a high production rate pace (such as assembly line work)." (Tr. 22.)  As to responding appropriately to supervision and coworkers in a work setting, Dr. Groneck opined that Ms. Willis "may have problems initiating and maintaining productive work relationships." (Tr. 322.)  Consistent with this finding, the ALJ adopted an RFC indicating that she could "interact on an occasional basis with supervisors, coworkers, and the general public." (Tr. 22.)  And as to responding appropriately to work pressures, Dr. Groneck opined that Ms. Willis would "likely struggle to think quickly on her feet," was "expected to feel overwhelmed with tasks requiring rapid and timed performance," and had mood symptoms that would likely be exacerbated by exposure to workplace pressures. (Tr. 322.)  Accordingly, the ALJ adopted an RFC that precluded tasks requiring a high production rate pace and further found that Ms. Willis could "respond appropriately to occasional change in a routine work setting." (Tr. 22.)

Relying on a conclusory assertion that the ALJ "erroneously failed to include the opined limitations in his RFC" (ECF Doc. 7, pp. 18-19), Ms. Willis has failed to identify any specific portion of Dr. Groneck's opinion that the ALJ failed to address in the RFC.  Importantly, the ALJ was not required to recite Dr. Groneck's opinion verbatim in his RFC nor was he required to "adopt [her] limitations wholesale." *Reeves*, 618 F. App'x at 275; *see Poe*, 342 F. App'x at 157.  As discussed above, based on a review of the evidence and the ALJ's written decision, the undersigned finds the ALJ adequately accounted for Dr. Groneck's medical opinion findings in the mental RFC, and that Plaintiff's conclusory argument to the contrary is without merit.

### ii. Consultative Examiner Carolyn Arnold, Psy.D.

The ALJ evaluated Dr. Arnold's medical opinion as follows:

36

> Dr. Arnold said that the claimant could understand and apply information although she lost track mid-task, she could perform self-care activities generally, she tended to self-isolate, and she could sustain concentration for up to an hour or more (9F/4). Dr. Arnold opined that the claimant could sustain concentration and persistent for simple tasks for a moderate amount of time and for multistep tasks for a short period (9F/5). According to Dr. Arnold, the claimant had limited social interactions and she was aggravated by other people (9F/5). Dr. Arnold concluded that the claimant adapted to her limitations by self-isolating and adjusting activities. <u>I find such opinion persuasive in part because Dr. Arnold examined the claimant. However, her opinion was relatively vague with little description of specific functional abilities or limitations</u>.

(Tr. 25 (emphasis added).)  Ms. Willis asserts, again without elucidation, that "none of [Dr. Arnold's] persuasive limitations were included in the RFC."  (ECF Doc. 7, p. 19.)  The Commissioner responds that the ALJ appropriately found Dr. Arnold's opinion findings to be "relatively vague" and appropriately accounted for any objective measurable guidance in the opinion.  (ECF Doc. 9, pp. 14-15.)  The Commissioner's arguments are well-taken.

Dr. Arnold's consultative examination report records a list of "functional information" that appears largely to be a summary of Ms. Willis's self-reported abilities and limitations, reflecting that Ms. Willis: can understand instructions, remember, and apply information; experiences brain fog in the form of losing track mid-task, sentence, or conversation, forgetting, and feeling overwhelmed by information or obligations; does not experience actual confusion; can perform self-care tasks on her own, go shopping when necessary, and handle finances; spends time with other people, specifically her friend and her daughter, and "can tolerate these interactions for up to an hour or more"; feels isolated and lonely and tends to self-isolate, but prefers it; is able to "sustain concentration and show persistence for up to an hour or more while sleeping, watching tv and laying [sic] in bed"; is able to "do few activities in timely manner and at a reasonable pace"; "has a reduced ability to work and do most physical activities"; and "has a reduced tolerance for loud noise" and "low motivation."  (Tr. 628.)

Following the above discussion of "functional information," Dr. Arnold provides the

following "functional assessment" of Ms. Willis at the conclusion of his report:

> The claimant can understand, remember and carry out instructions, follow a
> conversation and can think abstractly and apply reason when asked to interpret
> proverbs. The claimant's short-term memory was largely intact as evidenced by
> accurate recall of three of three words and five six digits forward immediately.
> Long term memory was intact as evidenced by the recall of three of the three words
> after a few minutes and the recall of a personal memory. Mental flexibility was less
> intact as evidenced by the recall of five of six numbers on Digit Span backward,
> spelling "world" correctly both backward and forward and exhibiting a relatively
> weak fund of knowledge.
>
> The claimant was able to sustain concentration and show persistence with simple
> tasks for a moderate period of time and multistep tasks for a short period of time.
> The claimant was distractible and fatigued as evidenced by the performance on the
> Serial 7s task.
>
> The claimant has limited social interactions, mostly with her friend and daughter.
> The claimant reported less difficulty with social interactions in the past, especially
> 20 years ago when she was married and has progressively become less social and
> less caring about life, a history of sometimes interacting well with co-workers and
> supervisors but often feeling uncomfortable and aggravated by other people and
> responding somewhat adequately to workplace pressures by talking to her boss and
> taking many days off. The claimant has adapted to limitations by remaining at
> home, self-isolating and adjusting activities.

(Tr. 629 (emphasis added).)  Thus, Dr. Arnold's "assessment" of Ms. Willis's mental functioning

was limited to findings that Ms. Willis: could understand, remember, and carry out instructions,

follow a conversation, think abstractly, and apply reason; had intact long term memory and

"largely intact" short-term memory; had "less intact" mental flexibility; could sustain

concentration and show persistence with simple tasks for a "moderate" period and with multistep

tasks for a "short" period; was distractible and fatigued; and had limited social interactions.  (*Id*.)

A "medical opinion" is defined in the Social Security regulations as "a statement from a

medical source about what [a plaintiff] can still do despite [her] impairment(s) and whether [she]

ha[s] one or more impairment-related limitations or restrictions" in the ability to perform the

physical, mental, or other demands or work, or to adapt to environmental conditions.  20 C.F.R.
§ 404.1513(a)(2).  In keeping with this definition, courts in this district have recognized that the
"vagueness of a medical opinion is a proper basis on which to afford it less weight."  *See, e.g.,*
*Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 747 (N.D. Ohio 2020) (citing *Gaskin v.*
*Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008)).

Here, the undersigned finds that the ALJ appropriately concluded that Dr. Arnold's
opinion findings were "relatively vague with little description of specific functional abilities or
limitations."  (Tr. 25.)  For example, as highlighted in the ALJ's discussion, Dr. Arnold's
findings that Ms. Willis could sustain concentration and show persistence with simple tasks for a
"moderate" period and with multistep tasks for a "short" period (*id.* (citing Tr. 629)) are vague as
to the specific limits of Ms. Willis "can still do despite [her] impairment(s)," 20 C.F.R. §
404.1513(a)(2).  The same may be said of Dr. Arnold's statement in the "functional information"
section of her report that Ms. Willis "is able to sustain concentration and show persistence for up
to an hour or more while sleeping, watching tv[,] and laying in bed."  (Tr. 628.)  Setting aside the
fact that this statement appears to document a self-reported limitation and addresses Ms. Willis's
functioning at home, rather than in the workplace, Ms. Willis's ability to sustain concentration
and show persistence "for up to a hour *or more*" lacks clear specificity as to what Ms. Willis can
still do despite her impairments.[5]  The ALJ therefore did not err in finding Dr. Arnold's opinion
partially persuasive because it was "relatively vague."  (Tr. 25.)

Turning to Plaintiff's assertion that none of Dr. Arnold's "persuasive limitations were
included in the RFC" (ECF Doc. 7, p. 19), the undersigned again notes that the ALJ was not
required to recite Dr. Arnold's opinion verbatim in his RFC nor was he required to "adopt [her]

---

[5] Plaintiff's statement that Dr. Arnold generally found she "could sustain concentration up to an hour" does not
accurately characterize the contents of Dr. Arnold's medical opinion.  (ECF Doc. 7, p. 19.)

limitations wholesale." *Reeves*, 618 F. App'x at 275; *see Poe*, 342 F. App'x at 157.  As to understanding, remembering, and carrying out instructions, Dr. Arnold found Ms. Willis could "understand, remember and carry out instructions, follow a conversation and . . . think abstractly and apply reason"; but as to maintaining attention, concentration, persistence, and pace, Dr. Arnold found Ms. Willis could sustain concentration and show persistence with simple tasks for a "moderate" period and with multistep tasks for a "short" period, and was distractible and fatigued.  (Tr. 629.)  Consistent with these findings, the ALJ adopted an RFC finding Ms. Willis was able to perform "simple, routine, and repetitive tasks," but not "tasks that require a high production rate pace (such as assembly line work)."  (Tr. 22.)  As to responding appropriately to supervision and coworkers in a work setting, Dr. Arnold observed that Ms. Willis had "limited social interactions" and tended to self-isolate.  (Tr. 629.)  Consistent with these findings, the ALJ adopted an RFC that limited Ms. Willis to "interact[ing] on an occasional basis with supervisors, coworkers, and the general public."  (Tr. 22.)  And as to responding appropriately to work pressures, Dr. Arnold observed that Ms. Willis had "less intact" mental flexibility (Tr. 629), and the ALJ there found that Ms. Willis was limited to "respond[ing] appropriately to occasional change in a routine work setting" (Tr. 22).  Based on a review of the evidence and the ALJ's written decision, the undersigned finds the ALJ adequately accounted for Dr. Arnold's medical opinion findings in the mental RFC, and Plaintiff's argument to the contrary is without merit.

As to the whole of Plaintiff's second assignment of error, for the reasons set forth above, the undersigned finds Plaintiff has not demonstrated that the ALJ failed to articulate how he considered the persuasiveness of Dr. Dib's opinion or that his persuasiveness determination was unsupported by substantial evidence.  She also has not shown the ALJ erred in how he evaluated

and incorporated the medical opinions of the consultative examiners into the RFC.  Accordingly, the undersigned concludes that Plaintiff's second assignment of error lacks merit.

### D.   Third Assignment of Error: The ALJ Properly Applied the Criteria of Social Security Ruling 16-3p in Evaluating Plaintiff's Symptoms

In her third assignment of error, Ms. Willis argues the ALJ failed to properly evaluate her symptoms in accordance with SSR 16-3p.  (ECF Doc. 7, pp. 21-24.)  Specifically, she asserts that the ALJ "failed to articulate any supportable rationale for his finding that Plaintiff's statements were not entirely consistent with the medical evidence," ignored the "totality of the evidence documenting Plaintiff's disabling symptoms," and did not support his finding with substantial evidence.  (*Id.* at p. 24.)  She also asserts, within the third assignment of error but apparently unrelated to the ALJ's subjective symptom analysis, that the ALJ's decision not to require the use of a cane for balance in the RFC was harmful error.  (*Id.* at p. 23.)

The Commissioner argues in response that the ALJ complied with 16-3p by discussing Ms. Willis's subjective reports and the objective evidence, considering the factors set forth in SSR 16-3p, and concluding on that basis that Ms. Willis's symptoms were not as disabling as alleged.  (ECF Doc. 9, pp. 15-19.)  The Commissioner also asserts that substantial evidence supported the ALJ's finding that Ms. Willis's cane was not medically necessary.  (*Id.* at p. 17.)

#### 1.   Legal Standard for Evaluation of Subjective Symptoms

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25,

2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 24), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).

### 2.    The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints

The ALJ found that Ms. Willis's medically determinable impairments could be expected to cause the alleged symptoms, but also found "the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence of record."  (Tr. 23.)  Review of his decision reveals that he considered Ms. Willis's subjective complaints, including: her allegations of constant pain while walking, sitting, and standing;

severe headaches and neck/lower back pain; numbness and tingling in her upper extremities; feelings of isolation, anger, and confusion with crying spells; an inability to lift over ten pounds; trouble bending, reaching, and climbing stairs; difficulty concentrating, following instructions, and completing tasks; and a poor ability to handle stress and change.  (Tr. 23.)  He also considered her reported daily activities, which consisted of preparing simple meals, caring for her personal hygiene, shopping, doing laundry and other household chores, and spending time with her roommate and daughter.  (Tr. 21-22.)

Consistent with SSR 16-3p, the ALJ then considered the medical evidence relating to Ms. Willis's medically determinable impairments.  (Tr. 23-24.)  He described her treatment records and clinical findings from 2020 through 2023, acknowledging her reports of pain, numbness, and tingling to providers, her treatment with physical therapy, trigger point injections in her shoulders and neck, and pain medication with some reports of improvement.  (*Id.*)  He discussed her spinal x-rays showing degenerative changes, multiple MRIs with both positive and negative findings, normal EMGs, and physical examinations typically showing some limited range of motion but full strength in the upper and lower extremities and normal gait.  (*Id.* (citing Tr. 451, 466, 493, 656, 676, 679, 683-94, 697, 702).)  The ALJ acknowledged that Ms. Willis repeatedly endorsed feelings of depression and was found on examination to be anxious and depressed (*id.* (citing Tr. 328-29, 343-55)) but noted that her mental status examinations otherwise contained largely normal findings (*id.* (citing Tr. 336, 343-55)).

The ALJ also considered and found persuasive or partially persuasive the opinions of the state agency medical and psychological consultants and the consultative examiners.  The state medical consultants found that Ms. Willis had the residual functional capacity to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6

hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday with no postural, manipulative, visual, communication, or environmental limitations.  (Tr. 81, 92, 104-05, 113-14.) But the ALJ explained that updated medical evidence established that Ms. Willis's spine conditions and migraines necessitated further postural, environmental, and reaching limitations, as set forth in the RFC.  (Tr. 25.)  The psychological consultants found that Ms. Willis could perform routine tasks in environments where changes are explained in advance.  (Tr. 82-83, 93-94, 105-06, 114-16.)  The ALJ found the opinions partially persuasive because they did not account for Ms. Willis's "mood and anxiety symptoms," which the ALJ found "restricted her to occasional interactions with others."  (*Id.*)  The ALJ's findings with respect to the medical opinions of the psychiatric consultative examiners were outlined in section VI.C.3., *supra*.

Finally, the ALJ again acknowledged the subjective complaints and explained the basis for his final RFC determination:

> With respect to the claimant's alleged symptoms and limitations, I find such assertions only partially consistent with the evidence. The record showed that the claimant had headaches and back and neck pain during the relevant period, although she had only intermittent complaints of such conditions. The evidence did not document the frequent debilitating headaches she described throughout the relevant period and her headaches began to improve with treatment. Additionally, while she had pain in her back with limited lower extremity strength on one occasion, she maintained an independent gait with no documented need for an ambulatory aid. Furthermore, she had relatively conservative treatment with therapy, medication, and injections. Accordingly, the record supports the finding that she could perform the reduced range of light work described in the residual functional capacity.
>
> In terms of her mental conditions, the claimant had mood and anxiety symptoms . . . for which she took medication. While she had impaired memory and concentration at one consultative exam, other exams during the relevant period showed intact cognition, appropriate behavior, logical thoughts, and intact insight and judgment. Such facts indicate that she could perform simple tasks in the relatively static and socially limited environment of the residual functional capacity.

(Tr. 26.) Thus, the ALJ considered the factors set forth in SSR 16-3p, clearly articulated how he considered the evidence of record in making his findings and made a determination that was supported by substantial evidence.

Plaintiff's conclusory argument that "the totality of the evidence documenting Plaintiff's disabling symptoms were ignored and/or disregarded by the ALJ" is underdeveloped and unsubstantiated. (ECF Doc. 7, p. 24.) Ms. Willis has failed to identify what specific evidence the ALJ is alleged to have ignored or disregarded and has failed to demonstrate that the ALJ's failure to address that evidence deprived his analysis of the support of substantial evidence.

For all of the reasons set forth above, the Court finds the ALJ appropriately addressed the subjective complaints, in accordance with regulatory requirements articulated in SSR 16-3p, and that Ms. Willis has not met her burden to demonstrate otherwise.

### 3. Substantial Evidence Supported the ALJ's Medical Necessity Finding

Although it does not relate to the ALJ's subjective symptom analysis, Plaintiff also argues in the third assignment of error that the ALJ committed harmful error by "[f]ailing to include the need for the noted cane in his RFC." (ECF Doc. 7, p. 23.) The Commissioner responds that the ALJ was barred from finding a cane to be medically required—and therefore could not require the use of a cane—because there was insufficient medical documentation to establish Plaintiff's need for a cane during the relevant period. (ECF Doc. 9, pp. 17-18.)

The Sixth Circuit has explained that a hand-held assistive device "cannot be considered an exertional limitation" for purposes of an RFC if it "was not a necessary device for claimant's use." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002); *see also Drew v. Comm'r of Soc. Sec. Admin.*, No. 1:23-CV-01353-DAC, 2024 WL 2294784, at *9 (N.D. Ohio May 21, 2024) ("The ALJ is not required to incorporate the use of a cane in the RFC unless the cane is medically required.") (citing *Carreon*). Under Social Security Ruling 96-9p, an ALJ may only

"find that a hand-held assistive device is medically required" if the record contains "medical documentation" that: (1) "establish[es] the need for a hand-held assistive device to aid in walking or standing"; and (2) "describ[es] the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

As to the first requirement, SSR 96-9p calls for medical documentation of "the need for a hand-held assistive device to aid in walking or standing," not simply provider notations that a claimant was observed using an assistive device. 61 Fed. Reg. at 34482; *see Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (collecting cases) ("[T]he fact that various physicians noted Mr. Barnes' use of a cane or a walker does not establish that an assistive device was medically necessary for purposes of SSR 96-9p."); *Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-01718-CEH, 2021 WL 5603393, at *10 (N.D. Ohio Nov. 30, 2021) ("Although various medical records note that Claimant presented at appointments using a cane, these notations do not meet the requirements of SSR 96-9p.").

As to the second requirement, SSR 96-9p calls for medical documentation "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)," not simply a prescription for a device. 61 Fed. Reg. at 34482; *see Barnes*, 2023 WL 2988346, at *8 (collecting cases). This is consistent with the Seventh Circuit's holding that SSR 96-9p requires an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012); *see also Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) ("[T]he legal issue does not turn on whether a cane was 'prescribed' for Spaulding, but whether a cane was 'medically required.');

46

*Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (finding prescription and references to use of cane without discussion of medical necessity to be insufficient to show medical necessity).

Importantly, the question before this Court is not whether Ms. Willis can present facts to support a finding that a cane was a medical necessity.  Even if the record contains substantial evidence to support such a finding, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Thus, this Court is tasked only with determining whether the ALJ lacked substantial evidence to support his finding that a cane was not medically necessary in this case.

In support of her argument that the ALJ should have adopted an RFC requiring the use of a cane for balance, Ms. Willis cites to Dr. Dib's medical opinion, which contains checkbox findings that she must "use a cane or other hand-held assistive device" for standing due to imbalance, pain, dizziness, and weakness, but does not "need a cane or other hand-held assistive device all of the time."  (ECF Doc. 7, p. 23 (citing Tr. 710).)  In finding this portion of Dr. Dib's medical opinion unpersuasive, the ALJ explained:

> While she treated the claimant, the evidence failed to establish the extreme degree of limitations that Dr. Dib described. Indeed, while the evidence showed headaches and spinal pain with some extremity numbness, the treatment notes did not show such significant problems standing, walking, or sitting. Likewise, there was no evidence of the ongoing need for a cane to stand.

(Tr. 25-26.)  As discussed in more detail in section VI.C.2., *supra*, the ALJ adequately articulated his reasons for finding the medical records do not "establish the extreme degree of limitations that Dr. Dib described."  (*Id.*)  After discussing records reflecting normal strength and gait, with treatments limited to medications, physical therapy, and trigger point injections (Tr. 23-24), the ALJ found Ms. Willis's allegations were only partially consistent with the evidence because "while she had pain in her back with limited lower extremity strength on one occasion, she maintained an independent gait with no documented need for an ambulatory aid" and "had

47

relatively conservative treatment with therapy, medication, and injections" (Tr. 26).  Thus, the ALJ's finding that the cane was not medically necessary was consistent with his well-supported observation that the treatment records documented Ms. Willis's maintenance of "an independent gait with no documented need for an ambulatory aid."  (*Id.*)

Even if this Court were to disregard the substantial evidence referenced by the ALJ in support of his medical necessity finding and to also assume that first requirement in SSR 96-9p—medical documentation of "the need for a hand-held assistive device to aid in walking or standing," 61 Fed. Reg. at 34482—is met by Dr. Dib's medical opinion, it is nevertheless evident that Plaintiff has also failed to identify evidence sufficient to meet the second requirement in SSR 96-9p—medical documentation "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  61 Fed. Reg. at 34482.  Without an "unambiguous opinion . . . stating the circumstances in which [the] assistive device is medically necessary," Ms. Willis cannot show that the ALJ lacked substantial evidence to support his finding that the cane was not medically necessary.  *Thacker v. Comm'r of Soc. Sec.*, No. 3:21 CV 1617, 2022 WL 3369533, at *3 (N.D. Ohio Aug. 16, 2022) (quoting *Tripp*, 489 F. App'x at 955); *see also Barnes*, 2023 WL 2988346, at *8 (collecting cases) ("Mr. Barnes has failed to identify any records describing the precise circumstances in which an assistive device was medically necessary and has thus not met the requirements of SSR 96-9p.").

For the reasons set forth above, the undersigned concludes that the ALJ's determination that a cane was not medically necessary was supported by substantial evidence.  Accordingly, the undersigned finds Plaintiff's third assignment of error is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

July 23, 2025

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).